UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER ALFONSO BELLMAN,

                              Civil Action No. 18-10872
         Plaintiff,      Honorable Thomas Ludington
                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.
_____/

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13] AND GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Walter Alfonso Bellman ("Bellman") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. #1). Both parties have filed summary judgment motions (Docs. #13, #14), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### I. RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Bellman is not disabled under the Act. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #14**) be **GRANTED**, Bellman's Motion for Summary Judgment (**Doc. #13**) be **DENIED,** and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **AFFIRMED**.

**II.  REPORT**

**A.  Background**

Bellman's alleged disability onset date was January 1, 2014. (Tr. 208). He was 45 years old at that time. (*Id.*). Bellman dropped out of school in the ninth grade. (Tr. 34-35). He has taken the GED test multiple times without success. (Tr. 36). When asked what prevents him from working currently, Bellman testified, "[his] spine…the doctor says it's messed up and can't be fixed." (Tr. 43). He testified that on a scale from one to ten, his pain was ten all the time. (Tr. 44). He was prescribed assistive devices, uses a walker, and takes pain medication. (Tr. 44, 55). In terms of past work experience, in 2006, Bellman worked as a dishwasher, and from 2010 to 2013, he had some self-employment income selling used items at a flea market-type setting. (Tr. 37-40, 181). He testified that he lives alone, and is able to pay bills with the help of his daughter, mother, and friends. (*Id.*). Bellman indicated that he is able to shop and drive. (Tr. 203).

At the hearing, Bellman testified that he was being treated by Dr. Logan, a psychiatrist, once every two weeks[1]. (Tr. 46, 51). He testified that he was on psychiatric medication, which "keep[s] [him] down…as far as [his] thinking." (Tr. 52). At the request of the state agency, on June 13, 2015, Bellman underwent a psychiatric evaluation conducted by R. Hasan, MD. (Tr. 390-92). Dr. Hasan diagnosed Bellman with Bipolar 1 disorder, mixed type with psychosis, antisocial personality trait, potential schizoaffective disorder, cannabis dependence, diabetes, back pain, and leg pain. (Tr. 392). Dr. Hasan indicated that Bellman has cognitive deficiency, problems with concentrating and focusing, a long history of behavioral problems, mood swings, problems getting

---

[1] Although Bellman testified that he sees Dr. Logan at Eastwood Clinics "[l]ike every two weeks," (Tr. 51), the transcript contains only one record from Eastwood Clinics – an August 26, 2016 intake assessment. (Tr. 1185-87).

2

along with others, memory problems, feels paranoid and hears voices. (Tr. 392). But, Dr. Hasan also opined that Bellman is able to understand, retain, and follow simple instructions. (*Id.*).

Bellman indicated on his Function Report that he has problems with personal care, indicating that he dresses and bathes "in pain." (Tr. 201). He also indicated that he has issues using the toilet ("have gone on myself yes"). (Tr. 201). He testified he does not do any chores around the house except he will take out "a little bag [] [of] trash." (*Id.*). Instead, he testified that he has "a 65-year-old girlfriend [that] come[s] by sometimes," to take care of him and household needs such as cooking, laundry, and cleaning. (Tr. 62). On days she does not come over, Bellman testified that his kids come over and take care of responsibilities such as cooking, cleaning, and doing the dishes. (Tr. 62).

Bellman has five children, none of whom live with him. (Tr. 33). When asked about his relationship with his kids, Bellman explained that his interactions with them as follows:

> [ALJ]: When they're over, are you able to, you know, interact with them and –
>
> [Bellman]: On their tablet. They can sit there and they say this or that. We talk.
>
> [ALJ]: Okay. So they're interacting with each other. Are you involved though?
>
> [Bellman]: No, dad just gets kisses and that's it… no playing, no hopscotch or jump rope with the girls or nothing like that.

(Tr. 60).

In response to the question, "are you able to read and write?" Bellman testified, "Yeah. I — I can't remember—I might have to read it a thousand times. If I have to read that, I'd have to read it over and over and over." (Tr. 64). The ALJ then clarified,

> [ALJ]: So if I understood that correctly, you know the words, it's just understanding what it means that you have to read over and over again to understand what the words mean to put the idea or thoughts together.
>
> [Bellman]: Or phrase with the whole paragraph. I couldn't –
>
> [ALJ] Okay.

3

> [Bellman]: – I will have to read that a couple times—… to get the understanding for not just one word, it's going to be a whole bunch of them and I forget what I already read []…and I got to read that a hundred times sometimes to figure …
>
> [ALJ]: Has that always been the case for you?
>
> [Bellman]: – Ever since elementary.

(Tr. 64-65).

However, in his disability application, Bellman indicated that he could read and understand English. (Tr. 190). And, the manner in which Bellman completed his Function Report generally shows he understood the form's various questions and was able to provide the information it requested about him, including his impairments and functional abilities. (Tr. 200-207).

Bellman's applications for DIB and SSI[2] were denied initially on June 30, 2015, and he timely requested a hearing thereafter. (Tr. 85, 100-102, 218). A hearing was held on October 4, 2016, before ALJ Crystal L. White-Simmons. (Tr. 11-21). During the hearing, impartial Vocational Examiner ("VE") Toni M. MacFarland testified, as did Bellman, represented by attorney Kathy Koziol. On March 20, 2017, the ALJ issued an Unfavorable Decision finding Bellman not disabled. (*Id.*). Bellman timely requested review from the Appeals Counsel on February 24, 2017. (Tr. 1, 7). The Appeals Council denied Bellman's appeal on January 24, 2018, and he timely filed the instant suit thereafter. (Doc. #1).

The Court has thoroughly reviewed the transcript in this matter, including Bellman's medical records, Function and Disability Reports, and testimony as to his conditions and resulting limitations. Instead of summarizing the rest of the information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

---

[2] It appears Bellman has also previously filed for disability benefits unsuccessfully. (*See, e.g.,* Tr. 11, 353).

### B. The ALJ's Application of the Framework for Disability Determinations

Under the Act, SSI and DIB benefits are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th

5

Cir. 1994).

Following the five-step sequential analysis, the ALJ found that Bellman is not disabled under the Act. At Step One, the ALJ found that Bellman has not engaged in substantial gainful activity since his alleged onset date, January 1, 2014. (Tr. 13). At Step Two, the ALJ found that Bellman had the following severe impairments: spine disorder; diabetes mellitus; hypertension; affective disorder; and chronic pancreatitis. (Tr. 14). At Step Three, the ALJ found that Bellman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*). But, at Step Three, the ALJ also found Bellman had moderate restrictions with concentration, persistence, or pace ("CPP"); mild difficulties interacting with others; and mild limitations caring for himself independently. (Tr. 15-16). The ALJ then assessed Bellman's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work except: no climbing ladders, ropes or scaffolds; no more than occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching or crawling; restricted to simple, routine and repetitive tasks; and requires the option to alternate between sitting and standing about every 30 minutes. (Tr. 16). At Step Four, the ALJ found Bellman has no past relevant work. (Tr. 19). At Step Five, considering Bellman's age, education, work experience and residual functional capacity, the ALJ found there are jobs that exist in significant numbers in the national economy that Bellman can perform. (Tr. 19).

### C. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Robbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, *supra* at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, *supra* at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial

7

evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**D. Analysis**

In his summary judgment motion, Bellman raises two arguments: (1) that the ALJ's RFC is not supported by substantial evidence as it relates to his physical impairments and "mental issues"; and (2) that the ALJ's hypothetical questioning to the VE did not adequately account for his anti-social personality disorder or his moderate limitations in concentration, persistence, and pace. (Doc. #13 at 10). For the reasons set forth below, Bellman's arguments lack merit.

*1. The ALJ's RFC is Supported by Substantial Evidence*

Bellman argues that the RFC determined by the ALJ "does not reflect [his] abilities and therefore, is not supported by substantial evidence." (Doc. #13 at 8). His entire argument is only about two pages long, and of that only one paragraph discusses the ALJ's handling of his particular impairments – the rest simply provides noncontroversial legal standards. The entirety of Bellman's actual argument is:

> The ALJ's decision does not accurately describe Mr. Bellman's abilities. The ALJ found Mr. Bellman had the RFC to perform sedentary work except no climbing ladders, ropes or scaffolds, no more than occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching or crawling; restricted to simple, routine and repetitive tasks; and requires the option to alternate between sitting and standing. []. In this case, we don't know what evidence the ALJ used to determine the plaintiff's abilities in formulating the RFC, and subsequently, cannot determine if his abilities were accurately assessed. The decision only referenced the "objective imaging and clinic evidence of record" as evidence that Mr. Bellman's impairments did not demonstrate an injury or pathology that could be expected to prevent his from performing the limited range of sedentary work. []. The decision vaguely claimed that Mr.

8

> Bellman had not pursued or complied with the type of treatment that would be expected of the disabled. [] Finally, there is no mention of the evidence that ALJ relied on in assessing Mr. Bellman's abilities based on his "mental issues". Because the RFC does not accurately describe Mr. Bellman's abilities, it is not supported by substantial evidence.

Bellman's argument lacks merit. First, as the claimant, it was his burden to prove his RFC by reference to record evidence. *See* 20 C.F.R. § 404.1512(a), 416.912(a); *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 436 (6th Cir. 2018) ("During the first four steps—which include a determination of the claimant's RFC—the claimant bears the burden of proof."); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) ("[t]he claimant ... retains the burden of proving her lack of residual functional capacity")). Thus, for Bellman to simply assert "we don't know what evidence the ALJ used" to determine his RFC is tantamount to no argument at all.

Moreover, Bellman's premise is simply wrong. He himself recognizes that the ALJ considered objective medical evidence – the "imaging and clinic" records in the transcript, and Bellman offers no argument whatsoever as to why that evidence (as well as other evidence) discussed in detail by the ALJ does not support the RFC. (Tr. 18-19). Indeed, review of the ALJ's decision shows he considered the full record before him, including Bellman's testimony, his self-reports, and reports from various physicians. (Tr. 17-19). The ALJ even found that Bellman's "presentation throughout the hearing" showed he had "greater work related physical limitations" than one non-examining state agency physician had found. (Tr. 18). The ALJ also relied on record evidence that Bellman generally ambulates without a cane, drives, goes outside, lives fairly independently (receiving some help with chores from others), used the stairs at his home, was found to have normal upper extremity and paraspinal strength, 4/5 lower extremity strength, and reported "some improvement" to his pain with medication as evidenced by his "daily activities". (Tr. 17-19, 819, 830, 837-38).

Indeed, treatment records from Dr. Syed Moosavi indicate, "[Bellman] has noticed an approximate [30%-40%] relief of pain and some improvement in function due to the prescribed medications and treatments as evidenced by the improvement in his tollerance [sic] of everyday activity. [He] reports that the amount of pain relief he is now obtaining does make a real difference in his life." (Tr. 816, 820). At doctors' appointments, Bellman consistently indicated that he did not have any sensory/motor deficits requiring special assistance. (Tr. 457, 536). The ALJ also questioned Bellman at the hearing about his self-employment income in the years leading up to his alleged onset date (including $7,389 in 2010, $9,235 in 2011, $9,931 in 2012, and $9,720 in 2013), and in the decision referenced Bellman's ability to engage in that work. (Tr. 13, 37-43, 186-87). Finally, the ALJ also appropriately noted that Bellman offered "no opinion [] evidence from any medically acceptable source that [he] has any greater physical limitations than as found by [the ALJ]." (Tr. 19). For all of these reasons Bellman has not shown that the ALJ erred in determining his physical RFC, and that determination is supported by substantial evidence.

Bellman devotes one sentence of his RFC argument to his mental impairments, stating only, "Finally, there is no mention of the evidence that [sic] ALJ relied on in assessing Mr. Bellman's abilities based on his 'mental issues'." (Doc. #13 at 10). But this is simply inaccurate. As the Commissioner notes, "[t]he ALJ thoroughly discussed the evidence supporting her evaluation of [Bellman's] mental impairments at the listing stage (*see* Tr. 14-16), and then incorporated her analysis by reference in the RFC section of her decision (Tr. 19)." (Doc. #14 at 9). Indeed, the ALJ discussed the opinions of (1) Dr. R. Hasan, M.D., who opined that Bellman could "understand, retain and follow simple instructions" (Tr. 392), (2) Dr. Kathy Morrow, Ph.D., who opined that Bellman "retain[ed] the mental capacity to engage in simple work activity" (Tr. 83), and (3) Dr. Nick Boneff, Ph.D., who opined that Bellman was "capable of engaging in simple

10

work type activities, remembering and executing a three or four-step repetitive procedure on a sustained basis . . ." (Tr. 356). In light of the way Bellman raised the issue, the Court will examine his substantive challenge to the mental RFC in the next section.

### 2. *The ALJ's Questioning of the VE as to Bellman's Mental Impairments is Supported by Substantial Evidence*

In addition to his arguments about the RFC, Bellman argues that the "hypothetical question proposed by the ALJ to the [VE] did not account for [his] anti-social personality disorder or moderate limitations in concentration, persistence, and pace . . ." (Doc. #13 at 10). At the hearing, the ALJ questioned the VE as follows,

> [ALJ]: So assume a hypothetical individual of the claimant's age and education and with no past relevant work; further assume that the individual is limited to a light exertional level with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs as well as occasional balancing, stooping, kneeling, crouching, and crawling and were limited to simple, routine, and repetitive tasks. Is there any work that individual could perform?
>
> [VE]: Yes, Your Honor. I'd be looking at light, unskilled work with an SVP of 2 and I believe that would fit your hypothetical. Types of work that there would be would be things such as housekeeping cleaner; the DOT of 323.687-014; there'd be approximately [] 250,000 of these types of jobs in the U.S. There would also be work as cashiers; a DOT code of 211.462-010; there'd be approximately 430,000 of these types of jobs in the U.S. And there would also be work as [] garment sorters; the DOT code of, [] 222.687-014; and there'd be approximately 160,000 of these types of jobs in the U.S.
>
> [ALJ]: All right. If we took that same hypothetical and added a sit/stand option after 30 minutes, is there work that individual could perform?
>
> [VE]: There would be, Your Honor, but I would eliminate all of the jobs I gave you previously.
>
> [ALJ]: Okay.
>
> [VE]: The types of work that would be still available I would preface my testimony with alternating positions sitting/standing; etc. is not in the Dictionary of Occupational Titles. So any opinion I give you is based on my knowledge of how these jobs are done or how they can be done. And there would be work, Your Honor, such as light, unskilled work with an SVP of 2 of information clerk;

11

> a DOT code of 237.367-018…[]… There would be office helpers; DOT code of 239.567-010; there'd be approximately 100,000 of these types of jobs in the U.S. And there would also be work as inspector and hand packager; a DOT code of 559.687-074; there are approximately 100,00 of these types of jobs in the U.S.
>
> [ALJ] All right. If we had an individual with a sedentary exertional level and then all the other limitations was [sic] the same as the second hypothetical, is there [work] that individual could perform?
>
> [VE] There would be, Your Honor. There would be a number of office jobs that could be done and that would be a document preparer; a DOT code of 249.587-018; there'd be approximately 60,000 of these types of jobs in the U.S. There would also be telephone jobs that could be done; a sample of that would be at telephone quotation clerk; a DOT code of 237.367-046; there'd be approximately 56,000 of these types of jobs in the U.S. There would also be work as sedentary inspectors; a sample of that would be table worker; a DOT code of 739.687-182[].
>
> [ALJ] All right. If we took any of the prior hypotheticals and added that the individual would be off task 20 percent of a workday or absent two or more days of a month, is there work that individual could perform?
>
> [VE] No, Your Honor, and either of those two items [] would be work preclusive.

Tr. 67-69.

Bellman argues that this hypothetical questioning of the VE was flawed because it failed to include limitations for his anti-social personality disorder and for his moderate limitations in concentration, persistence, or pace. (Doc. #13 at 11). The Commissioner does not directly address the adequacy of the ALJ's questioning to the VE. Instead, the Commissioner "respond[ed] to [Bellman's arguments] as challenges to the ALJ's mental RFC finding," rather than "in the context of a defective vocational expert hypothetical," as Bellman argues. (*See* Doc. #14 at 10, n. 2). Some courts have addressed arguments like Bellman's exactly as the Commissioner argues, *see*, *e.g.*, *Kirchner v. Colvin*, 2013 WL 5913972, at *11 (E.D. Mich. Nov. 4, 2013) ("Kirchner's Step Five argument is a veiled attack on the ALJ's underlying RFC finding" because "this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed.");

12

*Scott v. Comm'r of Soc. Sec.*, No. CV 18-10261, 2018 WL 6175375, at *7 (E.D. Mich. Nov. 5, 2018), while others have examined the issue from the standpoint urged by Bellman, by directly considering the ALJ's hypothetical questions to the VE, *see, e.g., Green v. Comm'r of Soc. Sec.*, No. 08-CV-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) (finding that "'moderate' concentration problems, even if not severe enough under the regulations to meet the listing of impairments for finding of disability at Step 3… need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5"); *Edwards v. Barnhart,* 383 F.Supp.2d 920, 930–31 (E.D. Mich. 2005) (hypothetical question to the VE limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace). Regardless, here, both the ALJ's RFC and questioning of the VE as to Bellman's mental impairments are supported by substantial evidence in the record.

Bellman's first argument is that the ALJ's finding that he "has only mild limitations interacting with others is not supported by substantial evidence," and that the hypothetical questions to the VE should have contained a limitation regarding Bellman's interactions with others. (Doc. #13 at 11-12). Bellman accuses the ALJ of "pick[ing] the evidence that was favorable to her findings," and notes that "[o]n multiple occasions the Michigan Department of Corrections and Consultative Examiners diagnosed [him] with an anti-social personality disorder or anti-social personality trait." (*Id.*). But Bellman's argument is simply an improper request for the Court to re-weigh the evidence. *See Williams v. Comm'r of Soc. Sec.*, 2018 WL 1322396, at *10 (E.D. Mich. Feb. 26, 2018) (an ALJ's decision cannot be reversed "merely because there exists some other evidence in the record that might support a different conclusion"); *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide

questions of credibility, or substitute its judgment for that of the ALJ."). Indeed, the ALJ referenced Bellman's prison records (which significantly precede his alleged onset date) and his testimony that therapy and medication helped him, and the fact that Dr. Hasan found him to have an "antisocial personality trait." (Tr. 15, 17, 51-52). More importantly to the substantial evidence analysis, the ALJ noted, among other evidence, Bellman's self-report that he "had no problems getting along with family, friends, neighbors or others," and that Dr. Morrow "opined that [Bellman] had mild problems interacting and relating with others." (*Id.*; Tr. 205, 79, 83).[3] In the same self report cited by the ALJ, Bellman indicated that he lives "with family," and that his hobbies include "talking to people." (Tr. 200, 204). Bellman also indicated that he had never been fired or laid off from a job because of problems getting along with other people, at least "not in over 25 years." (Tr. 206). And, Bellman testified that "buddies will come [to his house] and bring coney dogs . . ." (Tr. 62). Again, because substantial evidence supports the ALJ's finding, the Court must reject Bellman's invitation to re-weigh it against other evidence in the record that is favorable to him.

Bellman next argues that the ALJ's hypothetical questioning of the VE failed to include limitations for his moderate limitations in concentration, persistence, or pace. Bellman attacks this issue in two respects. First, he suggests that because the ALJ found he had moderate CPP limitations, the RFC restriction "to simple, routine and repetitive tasks" could never be sufficient. (Doc. #13 at 10). But no such bright-line rule exists.

Where an ALJ finds that a claimant has CPP deficiencies, failure to account for such deficiencies in the hypothetical question *may* constitute reversible error. *See Ealy v. Comm'r of*

---

[3] Bellman also testified that he had tried to open a "hat shop" with his "kids and some family and friends." (Tr. 37).

14

*Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010). While an ALJ is not required to include any particular phrase or talismanic language in an RFC to properly account for a claimant's CPP limitations, the hypothetical limitations chosen by the ALJ must be supported by substantial evidence. *See Barnes v. Comm'r of Soc. Sec.*, 2013 WL 6328835, at *14 (E.D. Mich. Dec. 5, 2013) (citing *Smith*, 307 F.3d at 378-79). Because there is no bright-line rule requiring an ALJ to account for moderate limitations in CPP in a certain way, the Court must – given the particular evidence in the case at hand – determine whether the limitations imposed by the ALJ adequately accounted for the claimant's moderate restriction in CPP. *See Summers v. Comm'r of Soc. Sec.*, 2016 WL 3769377, at *7 (E.D. Mich. June 2, 2016); *Mortzfield v. Comm'r of Soc. Sec.*, 2014 WL 1304991, at *16 (E.D. Mich. Mar. 31, 2014).

That leads to Bellman's second, evidence-based argument, in which he simply notes certain findings by Dr. Hasan, and then asserts, in a wholly conclusory fashion, that the ALJ' hypothetical question to the VE was flawed because it "only limited Mr. Bellman to simple, routine, repetitive tasks and failed to account for any limitation in concentration, persistence, and pace." (Doc. #13 at 12). Bellman notes that in addition to finding he had a problem with concentrating and focusing, Dr. Hasan found his speech was "spontaneous and blocked," his "motor activity was low," his "mood was depressed, anxious, and irritable," he "had fleeting suicidal and homicidal thoughts," and his future plans were to "[g]et away from bad people." (*Id.*; Tr. 391-92).

Bellman's argument lacks merit. First, some aspects of Dr. Hasan's report that Bellman highlights are simply his own self reports. Second, Bellman does not explain how many of the highlighted aspects relate to his CPP issues. (Tr. 390). Third, Bellman ignores that Dr. Hasan found he could "understand, retain and follow simple instructions," without including any additional concentration-specific limitations. (Tr. 15, 392). Similarly, and importantly, in addition

15

to finding that Bellman had the RFC to "engage in simple work activity," under the heading, "Rate the individual's sustained concentration and persistence limitations," Dr. Morrow found that Bellman was "Not significantly limited" with respect to his abilities to: "carry out very short and simple instructions," "perform activities within a schedule," "sustain an ordinary routine without special supervision," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace . . ." (Tr. 83). The ALJ also noted that Dr. Boneff found Bellman could perform "three- or four-step repetitive work tasks." (Tr. 14, 356). All of this evidence stands in contrast to cases like the one on which Bellman principally relies, *Cheeks v. Comm'r of Soc. Sec.*, 690 F.Supp.2d 592 (2009). *Cheeks* involved treating and consulting opinions that "overwhelmingly support[ed] the conclusion that [the claimant's] psychomotor impairments, i.e., pacing limitations, warranted mention in the question to the VE." *Id.* at 602. Unlike the opinions of Dr. Morrow and Dr. Hasan, the doctor in *Cheeks* found the claimant had "marked" limitations in "staying within a schedule and completing a workweek without psychologically based interruptions." *Id.* at 597. Similarly, in *Ealy*, 594 F.3d at 516, the Sixth Circuit found that a detailed CPP question to the VE was warranted because the state-appointed psychologist had "specifically limited [the claimant's] ability to sustain attention to complete simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" Again, here, no similar concentration-specific limitation was imposed by either Drs. Morrow or Hasan; to the contrary, Dr. Morrow found that Bellman could perform work consistent with the RFC determined by the ALJ "at a consistent pace." (Tr. 83).

Finally, other evidence cited by the ALJ and in the record also supports her RFC and hypothetical questioning of the VE. For instance, the ALJ noted Bellman's testimony and representations that he could concentrate if it is quiet, that he had been fairly recently self-

16

employed selling goods at a flea market, and that he regularly drove a car. (Tr. 15, 34, 37-38, 59, 203). The Commissioner also correctly notes that the transcript contains very few mental health treatment records since Bellman's alleged onset date, causing "the opinions of Drs. Hasan and Morrow to take on even greater evidentiary weight." (Doc. #14 at 12). *See Harrell v. Colvin*, No. 13-11161, 2014 WL 3845930, at *5 (E.D. Mich. Aug. 5, 2014) ("the ALJ reviewed Harrell's medical record as a whole and determined that she did not receive much treatment for her psychological issues. Thus, the ALJ relied on the mental status examination provided by a consultative psychologist.").

For all of these reasons, Bellman's argument that the ALJ's hypothetical questions to the VE needed an additional specific concentration limitation lacks merit, and the ALJ's RFC is supported by substantial evidence.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(Doc. #14)** be **GRANTED**, Bellman's Motion for Summary Judgment **(Doc. #13)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.

Dated: March 20, 2019      s/David R. Grand
Ann Arbor, Michigan      DAVID R. GRAND
     United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 20, 2019.

s/Eddrey O. Butts  
EDDREY O. BUTTS  
Case Manager
